UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| JEFFREY PAUL BARNARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:16-cv-00276-JAW |
| | ) | |
| STATE OF MAINE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER REJECTING THE RECOMMENDED DECISION OF THE MAGISTRATE JUDGE

As the factual premise of the plaintiff's lawsuit under 42 U.S.C. § 1983 conflicts with factual findings during the plaintiff's sentencing hearing that were essential in arriving at his sentence, the Court concludes that his lawsuit is barred under *Heck v. Humphrey*, 512 U.S. 477 (1994).

## I. BACKGROUND

### A. Procedural History

On June 3, 2016, Jeffrey Paul Barnard, acting pro se, filed a complaint under 42 U.S.C. § 1983 against a number of governmental entities and employees alleging that they harassed, threatened, and shot him in May-June 2014 and thereby violated his constitutional rights. *Compl.* (ECF No. 1). On August 1, 2016, Mr. Barnard moved to amend his Complaint, *Mot. for Leave to Amend* (ECF No. 11), and on August 19, 2016, the Magistrate Judge granted his motion and ordered it be filed. *Mem. of Decision Granting Mot. to Amend* (ECF No. 15). Mr. Barnard filed the Amended Complaint on August 19, 2016. *Am. Compl.* (ECF No. 16). In a decision dated August

19, 2016, the Magistrate Judge allowed the Amended Complaint to proceed "against Defendants Bires, Duff and Tokas." *Second Recommended Decision* at 4 (ECF No. 14).

On November 27, 2017, Maine State Police Trooper Scott Duff, one of the Defendants, filed a motion to dismiss Mr. Barnard's Amended Complaint. *Def. Scott Duff's Mot. to Dismiss* (ECF No. 43) (*Def.'s Mot.*). On March 15, 2018, the Magistrate Judge issued a recommended decision in which he recommended that the Court deny Trooper Duff's motion to dismiss. *Recommended Decision on Mot. to Dismiss* (ECF No. 47) (*Recommended Decision*). On March 29, 2018, Trooper Duff objected to the recommended decision. *Def. Scott Duff's Obj. to the Magistrate Judge's Decision Recommending Denial of his Mot. to Dismiss* (ECF No. 49) (*Def.'s Objection*).

Mr. Barnard has not participated in this lawsuit since September 18, 2017, when he filed a letter with the Clerk of Court supplying the addresses of Defendants Duff, Bires and Tokas, *Letter from Jeffrey P. Barnard to Office of the Clerk* (Sept. 14, 2017) (ECF No. 33), and specifically, he has not responded to Trooper Duff's motion to dismiss, to the Magistrate Judge's recommended decision, or to Trooper Duff's objection to the recommended decision.

### B. The Alleged Facts in the Amended Complaint

In his Amended Complaint, Mr. Barnard alleges that he was "harassed, threatened with deadly and lethal force, he was then shot in the Head/Face as a result of this threat by a Maine State Trooper." *Am. Compl.* ¶ 3. Mr. Barnard's Amended Complaint sets forth the backdrop for the firing of the shot that struck his head and face. *Id.* ¶¶ 11-24. Focusing on the lead up to the shot, Mr. Barnard recites his

recollection of the events that brought about a police standoff for about twenty hours. ¶ 23. Mr. Barnard alleges that Maine State Trooper Scott Duff was the individual who fired the shot that struck Mr. Barnard's head and face. *Id.* ¶ 24. Mr. Barnard recalls that during the time before the shooting, law enforcement "assaulted and attacked" his wife and him while they "were in the confines of our home, without showing any provocation toward these officer[]s until after they shot into our trailer, threw rocks at trailer, tried breaking window with a robot, and finally used an armored vehicle to penetrate and push our trailer." *Id.*

Mr. Barnard states that it was "only after these attacks did plaintiff retaliate." *Id.* Mr. Barnard says that he "yelled outside his window, several times during this standoff, that he did not want anyone to be harmed or hurt." *Id.* ¶ 25. Mr. Barnard alleges several ways he believes this shooting could have been avoided and ends by stating that he was "shot in the head unnecessarily and unlawfully with malicious intent." *Id.*

## II.  THE MOTION TO DISMISS

On November 27, 2017, claiming that Mr. Barnard's lawsuit should be dismissed for "multiple reasons," Trooper Duff moved to dismiss Mr. Barnard's Amended Complaint. *Def.'s Mot.* at 1. Trooper Duff first contended that the Court should dismiss Mr. Barnard's Amended Complaint under the seminal United States Supreme Court case of *Heck v. Humphrey*, 512 U.S. 477 (1994), which bars § 1983 lawsuits premised on the invalidity of a criminal conviction or sentence. *Id.* at 8-11. Next, Trooper Duff argued that the facts established during the sentencing hearing and alleged in the Amended Complaint confirm that Trooper Duff is entitled to

qualified immunity. *Id.* at 11-18. Finally, Trooper Duff maintained that Mr. Barnard's state tort law claims should be dismissed because they depend on the viability of his excessive force claim. *Id.* at 18-19.

## III.    THE RECOMMENDED DECISION

On March 15, 2018, the Magistrate Judge issued a recommended decision in which he recommended that the Court deny Trooper Duff's motion to dismiss the Amended Complaint. *Recommended Decision* at 24. Regarding the *Heck v. Humphrey* issue, the Magistrate Judge concluded that the bar did not apply because "a finding in Plaintiff's favor on his § 1983 claim does not necessarily imply the invalidity of his conviction or sentence." *Id.* at 8. The Magistrate Judge wrote that even though the Court "found that Plaintiff possessed and raised a rifle when he exited his home, the length of the sentence was discretionary and the Court cited several factors when, in establishing the sentence, the Court determined that Plaintiff's conduct created a substantial risk to the safety of others." *Id.* Thus, the Magistrate Judge concluded that the Court "conceivably could have imposed the same sentence without a finding that Plaintiff raised his rifle when he exited his home." *Id.* Because "a finding in favor of Plaintiff would not implicate the validity of Plaintiff's sentence," the Magistrate Judge concluded that Mr. Barnard's lawsuit was not barred by *Heck v. Humphrey. Id.*

Turning to qualified immunity, the Magistrate Judge engaged in a thorough and thoughtful analysis of the steps essential for a successful defense of qualified immunity. *Id.* at 8- 24. Again, because the Magistrate Judge concluded that "the Guideline sentencing range would likely have been the same regardless of whether

the Court found that Plaintiff raised his rifle in the direction of law enforcement, and given the Court's legitimate concern about the risk posed by Defendant's conduct during the standoff, including Plaintiff's discharge of a firearm multiple times during the standoff, the finding that Plaintiff raised his rifle in the direction of law enforcement before Defendant shot Plaintiff cannot be deemed essential to the judgment for purposes of issue preclusion." *Id.* at 24. Accordingly, the Magistrate Judge concluded that Mr. Barnard is "not collaterally estopped from litigating the issue in this case." *Id.*

## IV.   TROOPER DUFF'S OBJECTION

On March 29, 2018, Trooper Duff objected to the Magistrate Judge's recommended decision. *Def.'s Objection* at 1-18. Trooper Duff contends that the Magistrate Judge "construe[d] *Heck v. Humphrey* too narrowly." *Id.* at 2. Trooper Duff says that "[b]ecause Mr. Barnard could have invalidated his sentence by showing on direct appeal that the sentencing court committed clear error in finding that he raised his rifle toward an officer, his § 1983 action attacking that same finding is barred by *Heck* as necessarily implying the invalidity of his criminal sentence." *Id.* Also, Trooper Duff maintains that the Magistrate Judge "err[ed], for multiple reasons, in concluding that the sentencing court's finding was not 'essential' to the judgment for collateral estoppel purposes." *Id.*

## V.   LEGAL STANDARD

### A.   De Novo Review

The Court reviews any recommended decision by a magistrate judge on a dispositive matter under 28 U.S.C. § 636(b)(1)(B), which requires the Court "make a

de novo determination" of "those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.*; *United States v. Raddatz*, 447 U.S. 667, 673-74 (1980).

## B. Motion to Dismiss

When evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, a court must determine "whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiffs, the complaint states a claim for which relief can be granted." *Small Justice, LLC v. Xcentric Ventures LLC*, 873 F.3d 313, 321 (1st Cir. 2017) (quoting *Germanowski v. Fortuño-Burset*, 854 F.3d 68, 71 (1st Cir. 2017)). The Court need not assume the truth of conclusory allegations, and the complaint must state at least a "plausible claim for relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). However, "non-conclusory factual allegations in the complaint must . . . be treated as true, even if seemingly incredible." *Oscasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011).

A court may not "attempt to forecast a plaintiff's likelihood of success on the merits." *Id.* at 13. Furthermore, courts should be "solicitous of the obstacles that pro se litigants face, and . . . endeavor, within reasonable limits, to guard against the loss of pro se claims due to technical defects." *Dutil v. Murphy*, 550 F.3d 154, 158-59 (1st Cir. 2008).

In deciding a Rule 12(b)(6) motion, the Court may consider any documents attached to the complaint as well as any other documents "integral to or explicitly relied upon in the complaint, even though not attached to the complaint." *Trans-Spec Truck Servs. v. Caterpillar, Inc.*, 524 F.3d 315, 321 (1st Cir. 2008) (quoting *Clorox Co.*

*v. Proctor & Gambel Comm. Co.*, 228 F.3d 24, 32 (1st Cir. 2000)).  Under *Alternative Energy, Inc. v. St. Paul Fire & Marine Insurance Company*, 267 F.3d 30 (1st Cir. 2001), when ruling on a motion to dismiss, a court may not ordinarily consider documents outside the complaint, but there is a narrow exception "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Id.* at 33.

## VI.    FURTHER BACKGROUND

### A.    The Criminal Prosecution and Guilty Plea

The criminal prosecution against Jeffrey Paul Barnard was begun with a complaint filed on June 19, 2014, charging him with being a felon in possession of a firearm on June 1, 2014.  *United States v. Barnard, Compl.* (ECF No. 1), 1:14-cr-00088-JAW.  On July 17, 2014, a federal grand jury indicted him for being a felon in possession of a firearm and ammunition on May 31 and June 1, 2014.  *Indictment* (ECF No. 12).

On June 7, 2016, pursuant to a plea agreement, Mr. Barnard pleaded guilty to the federal charge.  *Min. Entry* (ECF No. 234).  The prosecution version that Mr. Barnard admitted to truth of at his Federal Rule of Criminal Procedure 11 asserted that he had been convicted of three prior felonies and on May 31 and June 1, 2018, he possessed a Marlin, Model 795, .22 caliber semi-automatic rifle and fifty-one rounds of Federal American Eagle .22 caliber ammunition.  *Prosecution Version of the Offense* (ECF No. 232).  The plea agreement contained no agreements regarding Mr.

Barnard's sentencing and no appeal waivers. *Agreement to Plead Guilty* (ECF No. 233).

**B. The Presentence Investigation Report and Guideline Calculations**

The Probation Office prepared a presentence investigation report and recommended the following guideline calculations:

| | |
|---|---|
| (1) The base offense level § 2K2.1(a)(6)(A): | 14 |
| (2) Use of a destructive devise § 2K2.1(b)(3)(B) | +2 |
| (3) Stolen firearm § 2K2.1(b)(4) | +2 |
| (4) Connection with another felony § 2K2.1(b)(6)(B) | +4 |
| (5) Obstruction of justice § 3C1.1 | +2 |
| (6) Reckless Endangerment | <u>+2</u> |
| (7) Total Offense Level | 24 |
| (8) Acceptance § 3E1.1(a) | <u>-2</u> |
| (9) Total Offense Level | 22 |

*Second Revised Presentence Investigation Report* at 6-7 (*PSR*). The Probation Office calculated Mr. Barnard's criminal history category as Category III. *Id.* at 12. Under the Probation Office calculation, with a total offense level of 22 and a Criminal History Category of III, Mr. Barnard faced a guideline sentence range of 51 to 63 months. *Id.* at 18.

The Probation Office explained why it concluded that Mr. Barnard was subject to a four-level "connection with" enhancement:

> Because the defendant used or possessed a firearm in connection with another felony offense, four levels are added under USSG § 2K2.1(b)(6)(B). Said

enhancement is applicable based upon the defendant's conduct during the stand-off, as Barnard threatened to shoot officers and blow up the camper. He also pointed a rifle at officer, fired multiple rounds from his rifle, and threw a Molotov cocktail at officers. This conduct resulted in multiple Maine state felony charges (i.e. Aggravated Reckless Conduct in violation of 17-A M.R.S.A. § 213, Terrorizing in violation of 17-A M.R.S.A. § 210, and Criminal Threatening in violation of 17-A M.R.S.A. § 209 and 17-A M.R.S.A. § 1252), and, whether officially convicted of such is irrelevant for the application pursuant to USSG § 2K2.1, comm. (n14[C]). Thus, a four-level enhancement is applicable.

*Id.* at 6.

### C. The Presentence Conference and Sentencing Positions of the Parties

The Court held a presentence conference on October 12, 2016 and the parties later filed presentencing memoranda. The Government identified seven factual issues and four legal issues. *Gov't's Mem. in Aid of Sentencing and Mot. for Upward Departure and Req. for a Variant Sentence* (ECF No. 254) (*Gov't's Mem.*). Mr. Barnard agreed that there were seven factual disputes and he identified three legal issues for resolution at the sentencing hearing. *Mem. of Law in Aid of Sentencing and Resp. and Opp'n to Gov't's Mem. in Aid of Sentencing; Mot. for Upward Departure; and Req. for Variant Sentence* (ECF No. 258) (*Def.'s Mem.*). Both the Government and Mr. Barnard agreed that among the factual-legal issues was whether he had possessed a firearm in connection with another felony under United States Sentencing Guideline § 2K2.1(b)(6)(B). *Gov't's Mem.* at 13-19; *Def.'s Mem.* at 10-11. Under § 2K2.1(b)(6)(B), a defendant who possesses a firearm in connection with another felony is subject to a four-level enhancement.

The Government argued that Mr. Barnard qualified for the enhancement based on his possession of a rifle in connection with the following potential felonies:

(1) criminal threatening with a dangerous weapon, (2) reckless conduct with a dangerous weapon, (3) terrorizing, and (4) aggravated reckless conduct. *Gov't's Mem.* at 13-19. Observing that he was never charged with any of these felony offenses, Mr. Barnard objected to the in connection with enhancement. *Def.'s Mem.* at 10. More specifically, he denied ever verbally threatening any officer or firing his rifle at any law enforcement officer. *Id.*

### D. The Sentencing Hearing

#### 1. The Disputed Shooting of Jeffrey Paul Barnard

The Court held an extended sentencing hearing on January 4, 2017. *Tr. of Proceedings*, *Sentencing Proceedings* at 1-206 (ECF No. 285) (*Tr.*). The Government called three law enforcement witnesses and the defense called two witnesses, including Mr. Barnard himself. *Id.* at 22-137. One admitted fact is that the standoff with the police on May 31-June 1, 2014 ended when Trooper Scott Duff shot Mr. Barnard in the face, causing an extensive injury to his left orbital bones. *PSR* ¶ 24. Mr. Barnard underwent several surgical procedures and he continues to suffer from permanent nerve damage and palsy as well as chronic dry eye. *Id.* The circumstances of the shooting were very much in dispute.

#### 2. The Government's Version

From the Government's perspective, on June 1, 2014, while Mr. Barnard was holed up in his trailer, surrounded by law enforcement officers, having thrown a Molotov cocktail onto the driveway, the Government resorted to using an armored vehicle called a Lenco to bang Mr. Barnard's trailer in an effort to dislodge him by inserting gas into the trailer and forcing Mr. Barnard out. Sergeant Jason Madore of

the Maine State Police was positioned in the Lenco. After the Lenco rammed the trailer, Sergeant Madore heard gunshots coming from inside the trailer and glass breaking. Sergeant Madore was able to insert the gas from the Lenco into the trailer. He then observed Mr. Barnard at the door of the trailer, holding a rifle.

Sergeant Madore said to the Tactical Team, "gun, gun, gun." He used what he called the "loud acoustic device" and said to Mr. Barnard, "Drop the weapon, State Police, drop the weapon." Mr. Barnard did not drop the weapon. Initially, Mr. Barnard had the rifle in the position of "low ready", pointing the barrel down to the ground at a forty-five degree angle. Mr. Barnard looked right toward the Lenco, then to the left, and then back to the right. He started to raise his rifle up toward Sergeant Madore in the Lenco. Sergeant Madore testified that he was thinking, "shoot, shoot, shoot", referring to his tactical team because he was afraid Mr. Barnard was going to shoot at the Lenco. Sergeant Madore said that he had a physical reaction to Mr. Barnard's raising the rifle; his legs tightened up and he sat back in his chair. As Mr. Barnard raised his rifle, Sergeant Madore heard a gunshot from his right and he saw Mr. Barnard get hit in the face.

### 3. Jeffrey Paul Barnard's Version

Mr. Barnard disputed much of the Government's view of the events leading up to his being shot. Critically, however, Mr. Barnard denied either standing in the doorway of his trailer or holding a gun in the seconds before he was shot.

Mr. Barnard acknowledged that he discharged his weapon six times within a brief period of time leading up to his being shot. He recalled that he shot his firearm twice after he heard what he thought were shots (it turned out that the police had

thrown rocks against the trailer).  Next, when the Lenco bumped his trailer, he discharged two more rounds into the floor of his trailer.  After the Lenco rammed his trailer a third time, he discharged his firearm again, with one round going into the floor and the other round into the casing around the window.[1]  He explained that he was not trying to shoot outside the trailer, but the force of the Lenco bump caused him to lose his footing.

Mr. Barnard recalled that after the police inserted a smoke box into the trailer, the whole trailer filled up with smoke.  He said that he had his gun in his hand when law enforcement inserted the smoke box.  Mr. Barnard recalled that his wife, Vicki, said, "I can't breathe, I can't breathe."  Mr. Barnard testified that he had his La-Z-Boy chair in front of the front door along with a table, and he put his gun on the La-Z-Boy to move the chair and table.  Mr. Barnard testified that he went over to the front door and opened it to get some air to breathe.  He said he grabbed a white flag, put the flag outside the door, waved it and pulled it back inside.  He then put his head out the door to get some air and was shot.

### 4.    The Court's Findings

After confirming what facts were and were not disputed, the Court made findings regarding the disputed facts leading up to Mr. Barnard being shot:

> I think the most critical question here, it strikes me, is whether the defendant actually came out and raised his rifle in a fashion that precipitated this shot. On this issue, I would reiterate or remind the parties about the statement of Sergeant Madore.  Sergeant Madore testified that he was in the armored vehicle at the time that the defendant emerged from the side door; that he clearly witnessed the defendant holding a rifle; that Madore himself said, gun,

---

[1]    Mr. Barnard disputed whether the round actually went out the window or whether it lodged in the window frame.  The Court does not need to resolve that issue.

gun, gun and drop the weapon; that he saw the defendant look from his left to his right and to his left again; that he was holding the rifle down; that he began to raise the rifle. Sergeant Madore said that he worried that the defendant was about to shoot him and that both of his legs tightened up, and it was at that point that the defendant was shot in the face. That the rifle dropped to the defendant's right and then the defendant returned to the trailer.

I find that statement credible. I find his version of the events credible. I do not find the defendant's statement credible that he had put a white flag out and that he had briefly emerged from the trailer without a rifle to be credible at all. To believe that, you would have to come to the conclusion that the police, who had been - - who had surrounded the trailer for onwards of 17 hours, would have essentially, without any cause or justification, have shot him in the head, an action that may well have, from the perspective of the officer who's doing the shooting, killed him, and that they would have waited patiently for 17 hours and the minute he poked his head out of the trailer, they shot him, effectively to kill him.

I don't believe that. I don't believe that the defendant's recollection of that is accurate. I think he's viewing the circumstances in a light most favorable to himself in order to justify his own actions and see - - and paint himself as a victim.

Instead, I believe the testimony of the sergeant, who, to my mind, had a clear and articulate recollection of the events and himself felt that had the defendant time - - had time - - had any time passed, he may himself have been subject to being shot at by the defendant. So I reject the defendant's testimony on that issue. I accept the officer's testimony on that issue. And I also note that it's consistent with Diane Tennies' view of the defendant's ability to, in his own mind, alter past facts to make himself look better than he actually was.

*Tr.* 158:22-160:15.

### 5. The Court's "In Connection With" Analysis

Based on its findings, the Court imposed the four-level enhancement under

U.S.S.G. § 2K2.1(b)(6)(B):

> The court has found that the defendant threatened the officers; that the defendant used his firearm during the course of the standoff; that he fired his firearm, both intentionally and perhaps, in terms of direction, accidentally; and, ultimately, that he stood at his doorstep and began to point a rifle directly at an officer. Accordingly, based on these findings, the court does apply the four-level enhancement under Section 2K2.1(b)(6)(B).

*Id.* 165:23-66:6.

### 6.    The Court's Guideline Calculations

The Court accepted all of the Probation Office's recommendations, except granting Mr. Barnard the two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a).  *Id.* 168:11-69:15.   The Court included the four-level enhancement under § 2K2.1(b)(6)(B).  *Id.*  The Court's guideline calculations resulted in a guideline sentence range of 63 to 78 months.  *Id.* 169:7-9.

### 7.    The Government's Sentencing Argument

After reviewing the events leading up to Trooper Duff's shooting of Mr. Barnard, the federal prosecutor described the point when Mr. Barnard emerged from his trailer as "the pinnacle of the armed standoff."  *Id.* 173:5-7.  He described how Mr. Barnard stood in his doorway armed with a rifle and began to raise it and point it in the direction of the armed vehicle.  *Id.* 173:7-11.  The Assistant United States Attorney argued that the defendant had put the general public and law enforcement officers in danger:

> With that being said, Mr. Barnard doesn't have the right to threaten officers; he doesn't have the right to attack them; he doesn't have the right to put their lives in danger, which he has now done on multiple occasions.  The government submits, therefore, that a severe sentence is appropriate, if nothing else, just to assure that officers are safe, along with the community.

*Id.* 176:20-77:1.

### 8.    Jeffrey Paul Barnard's Sentencing Argument

In his sentencing argument, defense counsel conceded that Mr. Barnard had been involved in a "dangerous situation" and that he "brought it on, that he is responsible for this standoff."  *Id.* 178:7-9.  He argued that the best way to protect the

14

public would be for the Court to impose a sentence that would mandate that Mr.

Barnard get the help he needed. *Id.* 181:21-82:2; 183:22-25.

### 9.    The Court's Sentencing Rationale

Before pronouncing its sentence, the Court extensively reviewed Mr. Barnard's

history and characteristics and the nature and circumstances of the offense. *Id.*

185:20-200:17. The Court specifically addressed the police shooting:

> Short of the actual use of a firearm by a felon to injure or kill someone, from my perspective, this type of possession is the most egregious and dangerous possession by a felon imaginable, and as it turns out, unfortunately for the defendant, the risk of serious harm, which was present for everyone on the scene, including these outstanding, I might add, police officers who come to protect us in situations like this, that the person who suffered the risk of the danger that he created turned out to be the defendant himself, and he suffered a terrible gunshot wound to the face and head, and he is very lucky to have survived. But it was undoubtedly a situation of his own making.

*Id.* 195:9-20. The Court imposed a seventy-eight month period of incarceration, the

top of the guideline range, three years of supervised release, and a $100 special

assessment. *J.* (ECF No. 279).

## VII.   LEGAL STANDARDS

In *Heck v. Humphrey*, the United States Supreme Court addressed whether a

state prisoner could "challenge the constitutionality of his conviction in a suit for

damages under 42 U.S.C. § 1983."[2] 512 U.S. at 478. The Supreme Court ruled:

> We think the hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments applies to § 1983 damages actions that necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement . . . .

*Id.* at 486. Specifically, the Supreme Court held:

---

[2]    The Magistrate Judge properly recognized that the *Heck v. Humphrey* holding has been extended to civil rights claims brought by federal prisoners. *Recommended Decision* at 6.

"[T]o recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.

*Id.* at 487; *see also Thore v. Howe*, 466 F.3d 173, 179 (1st Cir. 2006). None of the listed prerequisites for rendering invalid the sentence in this case has occurred, and the issues in Mr. Barnard's § 1983 claim do not challenge the validity of his conviction. Therefore, the only question is whether Mr. Barnard's § 1983 lawsuit would render his sentence invalid. The narrow issue is whether Mr. Barnard could succeed on his § 1983 lawsuit against Trooper Duff without undercutting the legality of his sentence.

In the recommended decision, the Magistrate Judge concluded that because the Court "conceivably could have imposed the same sentence without a finding that Plaintiff raised his rifle when he exited his home," a finding "in favor of Plaintiff would not implicate the validity of Plaintiff's sentence." *Recommended Decision* at 8. The Magistrate Judge observed that the Court "cited additional factors" in determining that Mr. Barnard's conduct "created a substantial risk to the safety of others." *Id.*

The Defendant objects to this standard as being improper because if the Court relied on clearly erroneous facts in selecting its sentence, the sentence itself would have been invalid. The Defendant points to *United States v. Cotto-Negrón*, 845 F.3d 434, 438 (1st Cir. 2017) for the proposition that a sentence based on "clearly erroneous facts" is not procedurally reasonable. *Def.'s Objection* at 8-9 (citing *Cotto-Negrón*, 845

16

F.3d at 438). Trooper Duff contends that if Mr. Barnard could have demonstrated on appeal or post-conviction that the Court's finding about his raising the firearm was clearly erroneous, he could have demanded that his sentence be vacated. *Id.* at 10.

## VIII.  DISCUSSION

The Magistrate Judge has an unenviable task of attempting to glean from a written transcript the dynamics of another judge's sentencing.  Here, as the sentencing judge, the Court well recalls Mr. Barnard's sentencing hearing and the Court concludes that whether Mr. Barnard raised his firearm was critical to the Court's sentence of seventy-eight months.[3]

To explain, Mr. Barnard sustained a grievous injury to his face when he was shot on June 1, 2014.  According to the PSR, the bullet "entered the defendant's right medial canthus and turned downward into his left [cheek] area, resulting in left orbital fractures.  The defendant underwent several surgical procedures thereafter and was deemed to have permanent nerve damage and palsy, as well as chronic dry eye syndrome." *PSR* ¶ 45.  The photograph of Mr. Barnard in the PSR confirms that he had not fully recovered from the bullet wound when the photograph was taken, and the Court's recollection is that he continued to suffer from the shot during his sentencing hearing.  Tragically, his face has remained somewhat disfigured and he has some difficulties with speech.

---

[3] In his Recommended Decision, the Magistrate Judge also addressed whether Plaintiff's §1983 action is barred by the principle of collateral estoppel.  As the Plaintiff's claim is barred under *Heck*, the Court does not reach this issue.

If the Court had accepted Mr. Barnard's version of the events leading to his being shot, this would have meant that after the police infiltrated his trailer with smoke, he merely stuck his head out of his door to get a breath of fresh air and was unarmed when a law enforcement sharpshooter shot him in the face. In other words, in Mr. Barnard's view, law enforcement tried to smoke him out and, when the tactic worked and he appeared outside, they shot him. Even assuming that Mr. Barnard illegally possessed a firearm and that he had otherwise acted very badly during the entire time from May 31 to June 1, 2014, his conduct would not have justified being shot in the face unless the officers were themselves in danger. For sentencing purposes, if it had accepted his version, the Court would have taken into account that he had suffered and was going to continue to suffer from an unjustified law enforcement shot in ways more permanent and more painful than any term of incarceration for his other criminal conduct. In other words, his version of the events would have cried out for a lesser punishment because he had already been significantly punished by the police.

Instead, the Court found that his memory of the events was flatly incorrect. The Court found that when he exited the residence, he illegally possessed a stolen firearm, that he raised that firearm in the direction of one of the officers, and that he was shot to prevent his shooting another officer. In this scenario, rather than a victim of unjustified police action, Mr. Barnard's actual use of the firearm greatly exacerbated the nature and circumstances of his own offense, since his illegal possession of the firearm escalated into patently dangerous conduct with the firearm.

Furthermore, his risky conduct was the culmination of two days of rash and troubling actions that had led to the standoff to begin with and had unnecessarily prolonged it. Finally, his egregious actions in raising the firearm against the police meshed with his history and characteristics, which unfortunately reflect a temper quickly lit and long-burning combined with an unusual capacity for self-justification. For sentencing purposes, the Court took into account, as it stated at the time, that his being shot was the consequence of "a situation of his own making."

The Magistrate Judge is correct that the guideline sentence range would have been the same regardless of the Court's finding on Mr. Barnard's holding and raising a rifle outside his home just before being shot. The Court imposed the four-level § 2K2.1(b)(6)(B) enhancement because Mr. Barnard had threatened the officers, used his firearm during the standoff, fired his firearm, both intentionally and perhaps in terms of direction accidentally, and finally stood at his doorstep and began to point his rifle directly at an officer. *Tr.* 165-22-66:6. Even so, the Court considered Mr. Barnard's action in holding and raising a rifle the type of possession of a firearm by a felon that is "the most egregious and dangerous . . . imaginable." *Tr.* 195:11-12. Absent such a finding, especially in light of the serious physical injuries Mr. Barnard sustained, the Court may well have imposed a sentence at or below the low end of the sentencing guideline range in this case.

Applying *Heck* and its progeny to these facts, the Court concludes that if the First Circuit had ruled that the Court's findings on the events immediately preceding Mr. Barnard's being shot were clearly erroneous, it is likely the First Circuit would

have vacated Mr. Barnard's sentence and remanded it for further sentencing without this finding. In explaining the duties of appellate courts, the United States Supreme Court noted:

> [An appellate court] must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, <u>selecting a sentence based on clearly erroneous facts</u>, or failing to adequately explain the chosen sentence - - including an explanation for any deviation from the Guidelines range.

*Gall v. United States*, 552 U.S. 38, 51 (2007) (emphasis supplied); *United States v. Sosa-González*, No. 17-2005, 2018 U.S. App. LEXIS 22519, at *6-7 (1st Cir. Aug. 14, 2018); *United States v. Martin*, 520 F.3d 87, 92 (1st Cir. 2008). Indeed, the First Circuit uses a "two-step parvane" in evaluating claims of sentencing error: first examining for procedural error and then assessing the substantive reasonableness of the sentence. *United States v. Arias-Mercedes*, No. 17-1229, 2018 U.S. App. LEXIS 23285, at *4 (1st Cir. Aug. 16, 2018) (quoting *United States v. Matos-de-Jesús*, 856 F.3d 174, 177 (1st Cir. 2017)). A sentencing court commits a procedural error when it "predicat[es] a sentence on clearly erroneous facts." *United States v. Del Valle-Rodríguez*, 761 F.3d 171, 176 (1st Cir. 2014).

As the Court premised its seventy-eight month sentence in significant, though not exclusive, part on its finding that Mr. Barnard had been shot from "a situation of his own making", the "strong judicial policy against the creation of two conflicting resolutions arising out of the same or identical transaction" comes into play. *Heck*, 512 U.S. at 484. The *Heck* Court expressed its concern for "finality and consistency" in judicial rulings. *Id.* In evaluating Mr. Barnard's civil lawsuit, it is difficult to see

how his claim against Trooper Duff, if successful, would not contradict this Court's sentencing finding that he, not Trooper Duff, was the one responsible for his own unfortunate injuries. Accordingly, the Court concludes that Mr. Barnard's § 1983 lawsuit against Trooper Duff is barred by *Heck*.

## IX. CONCLUSION

The Court REJECTS the Magistrate Judge's recommended decision (ECF No. 47) and GRANTS Defendant Scott Duff's Motion to Dismiss (ECF No. 43).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 28th day of August, 2018