## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| JEFFREY PAUL BARNARD, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 1:16-cv-00276-LEW |
| | ) | |
| STATE OF MAINE, et al. | ) | |
| | ) | |
| Defendants | ) | |

## ORDER ON MOTIONS FOR COPIES AND TO APPOINT COUNSEL
## AND RECOMMENDED DECISION ON DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

In this action, Plaintiff claims Defendants Troy Bires and Barton Tokas, police officers employed by the City of Ellsworth, used excessive force during an encounter with Plaintiff on May 31, 2014. (Amended Complaint at 1, ECF No. 16.) The matter is before the Court on Defendants' motion for summary judgment, (ECF No. 58), Plaintiff's motion for copies, (ECF No. 60), Plaintiff's motion to delay summary judgment ruling, (ECF Nos. 60, 62, 63), Plaintiff's motion for additional discovery, (ECF Nos. 60, 62, 63), Plaintiff's motion to amend the complaint, (ECF Nos. 60, 62, 63), and Plaintiff's motion to appoint counsel. (ECF Nos. 62, 63.)

Following a review and consideration of the parties' submissions and the record, I deny the motion for copies, deny the motion to delay summary judgment ruling, deny the motion to amend the complaint, and deny the motion to appoint counsel. I also recommend the Court grant in part and deny in part Defendants' motion for summary judgment.

## I. MOTION FOR COPIES, MOTION TO DELAY SUMMARY JUDGMENT RULING, MOTION FOR DISCOVERY, AND MOTION TO AMEND COMPLAINT

Plaintiff requests that he be provided, at Defendants' expense, copies of the documents found in the first twenty-eight docket entries of this case because his own copies of those documents, along with other legal materials and records, were lost or destroyed when he was transferred from the Somerset County Jail to Federal Bureau of Prisons custody. (Motion for Copies, ECF No. 60.) Plaintiff also moves for an extension or "equitable tolling" of the discovery deadline and requests the Court delay ruling on the summary judgment motion until after he has conducted additional discovery. (*Id.*; Plaintiff's Response to Defendant's Summary Judgment Motion at 13 – 16, 38, ECF No. 62, 63). Furthermore, Plaintiff seeks to amend his Amended Complaint to add claims for retaliation and destruction of evidence against Defendants and other government actors. (*Id.*; Plaintiff's Response to Defendant's Summary Judgment Motion at 14 – 17.)

"Rule 16(b) requires that the district court enter a scheduling order setting certain deadlines," including a deadline for the parties to amend the pleadings and a deadline for discovery. *Somascan, Inc. v. Philips Med. Sys. Nederland, B.V.*, 714 F.3d 62, 64 (1st Cir. 2013) (citing See Fed.R.Civ.P. 16(b)(1)). To obtain an amendment of the scheduling order, a party must demonstrate "good cause." *Johnson v. Spencer Press of Maine, Inc.*, 211 F.R.D. 27, 30 (D. Me. 2002); *El–Hajj v. Fortis Benefits Ins. Co.,* 156 F. Supp. 2d 27, 34 (D. Me. 2001); Fed. R. Civ. P. 16(b)(4). A court's decision on good cause "focuses on the diligence (or lack thereof) of the moving party more than it does on any prejudice to the party-opponent." *Steir v. Girl Scouts of the USA,* 383 F.3d 7, 12 (1st Cir. 2004).

Rule 56(d) allows a court to permit discovery and "defer considering" a summary judgment motion if "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). The party seeking delay or discovery "must (1) articulate a plausible basis for the belief that discoverable materials exist which would raise a trialworthy issue, and (2) demonstrate good cause for failure to have conducted the discovery earlier." *Price v. Gen. Motors Corp.*, 931 F.2d 162, 164 (1st Cir. 1991).

Plaintiff fails to establish good cause to support his requests. Plaintiff maintains he has been without the files since early 2017, but does not explain why he could not have pursued discovery within the original deadline without the missing files, and offers no explanation for his lengthy delay in bringing the issue to the Court's attention. Furthermore, Plaintiff does not explain how the documents would alter the Court's summary judgment analysis.

Plaintiff has also not shown good cause for another amendment to his complaint. Plaintiff offers only bald and conclusory allegations to support his contention that Defendants were involved in the events that allegedly caused Plaintiff to become separated from his file materials. For that reason, Plaintiff has not established the necessary cause for the amendment, nor a basis for Defendants to incur the cost of producing copies of the docket entries. The Court, however, will direct the Clerk to forward to Plaintiff a copy of the Court's docket sheet in the case. If upon review of the docket sheet, Plaintiff determines there are specific documents he needs, Plaintiff can renew his request, with a supporting

explanation, for the documents. If Plaintiff files such a motion, the Court will assess whether to order the production of the documents.

Finally, as part of his request to amend, Plaintiff seeks to join individuals who are not currently parties to the case. Given the length of time this action has been pending, I am not persuaded that the joinder of new parties at this stage of the proceedings is warranted. To the extent Plaintiff believes he has a cause of action against any individuals who are not parties to this case, Plaintiff can pursue the claims in separate action.

## II.   MOTION TO APPOINT COUNSEL

Plaintiff asks the Court to "[a]ppoint professional counsel to represent this plaintiff in this civil rights action at this time to allow him meaningful access to the courts." (Plaintiff's Response to Defendant's Summary Judgment Motion at 43, ECF No. 62, 63).

"There is no absolute constitutional right to a free lawyer in a civil case." *DesRosiers v. Moran*, 949 F.2d 15, 23 (1st Cir. 1991). The in forma pauperis statute provides that the Court "may request an attorney to represent any person unable to afford counsel." 28 U.S.C. § 1915(e)(1). The appointment of counsel under the statute is discretionary, but generally is limited to "exceptional circumstances." *DesRosiers*, 949 F.2d at 23. "[A] court must examine the total situation, focusing, inter alia, on the merits of the case, the complexity of the legal issues, and the litigant's ability to represent himself." *Id.* at 24. For example, the presence of "readily mastered facts and straightforward law" would suggest that a request for counsel "should be denied in a civil case." *Id.* Denial of an indigent plaintiff's request for counsel is error only if the denial

"was likely to result in fundamental unfairness impinging on his due process rights." *Id.* at 23.

This Court has already considered and denied an earlier motion to appoint counsel for Plaintiff. (ECF Nos. 13, 18.) The Court reasoned that the law and facts relevant to Plaintiff's case are sufficiently straightforward so that Plaintiff would be able to represent himself. *Id.* Plaintiff has not presented any reasons or new arguments that might change the Court's conclusion. Accordingly, Plaintiff's motion for appointed counsel is denied.

## III. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'" *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)).

A court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor. *Perry v. Roy*, 782 F.3d 73, 77 (1st Cir. 2015). If a court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of the Plaintiff's claims, a trial-worthy controversy exists, and summary judgment must be denied as to any supported claim. *Id.* ("The district court's role is limited

to assessing whether there exists evidence such that a reasonable jury could return a verdict for the nonmoving party." (internal quotation marks omitted)).  Unsupported claims are properly dismissed.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

## SUMMARY JUDGMENT RECORD

When presented with a summary judgment motion, a court ordinarily considers only the facts included in the parties' statements of material facts, which statements must be supported by citations to evidence of record.  Federal Rule of Civil Procedure 56(c) and District of Maine Local Rule 56(b) – (d) require the specific citation to record evidence. In addition, Local Rule 56 establishes the manner by which parties must present their factual statements and the evidence on which the statements depend.  A party's pro se status does not relieve the party of the obligation to comply with the court's procedural rules.[1] *Ruiz Rivera v. Riley*, 209 F.3d 24, 27 – 28 & n. 2 (1st Cir. 2000); *Marcello v. Maine*, 489 F. Supp. 2d 70, 77 (D. Me. 2007).

By rule, a party seeking summary judgment must file, in addition to its summary judgment motion, a supporting statement of material facts setting forth each fact in a separately numbered paragraph, with each factual statement followed by a citation to evidence of record that supports the factual statement.  D. Me. Loc. R. 56(b).  A party opposing a motion for summary judgment must file an opposing statement in which it

---

[1] "[T]he Court is required to maintain a strict neutrality between opposing parties and even though a more forgiving reading may be appropriate for a pro se party in the summary judgment context, it is also true that '[j]udges and magistrate judges who review these filings must be able to rely on procedural rules so as to avoid becoming the lawyer for the unrepresented [party] or devoting an excessive portion of their time to such cases.'"  *United States v. Baxter*, 841 F. Supp. 2d 378, 383 (D. Me. 2012) (quoting *Clarke v. Blais*, 473 F. Supp. 2d 124, 129 (D. Me. 2007)).

admits, denies, or qualifies the moving party's statements by reference to each numbered paragraph, with citations to supporting evidence, and in which it may set forth additional facts, in separately numbered paragraphs, with citation to supporting evidence. D. Me. Loc. R. 56(c). If an additional statement is introduced by the non-moving party, the moving party must file a reply statement in which it admits, denies, or qualifies the non-moving party's additional statements by reference to each numbered paragraph, with citations to supporting evidence. D. Me. Loc. R. 56(d).

"Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." D. Me. Loc. R. 56(f). Additionally, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment." *Id.* Finally, "[t]he court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts." *Id.*

Nevertheless, the factual assertions contained in the verified pleadings and affidavits filed by a pro se litigant generally will be considered in the review of a summary judgment motion. That is, where a pro se litigant has failed to comply strictly with the summary judgment rules, this Court has considered the sworn assertions of record. *See Clarke v. Blais*, 473 F. Supp. 2d 124, 128 – 30 (D. Me. 2007) ("The First Circuit has not addressed this notice debate directly, but has said, in the summary judgment context, that unrepresented plaintiffs' opposing affidavits and opposition papers are to be read 'liberally.'" (citing *Posadas de Puerto Rico*, *Inc. v. Radin*, 856 F.2d 399, 401 (1st Cir.

1988), and *Mas Marques v. Digital Equip. Corp.*, 637 F.2d 24, 27 (1st Cir. 1980));

*Demmons v. Tritch*, 484 F. Supp. 2d 177, 182 – 83 (D. Me. 2007). The First Circuit has

determined that:

> a verified complaint ought to be treated as the functional equivalent of an
> affidavit to the extent it satisfies the standards explicated in Rule 56(e) (in
> summary judgment milieu, affidavits "shall be made on personal knowledge,
> shall set forth such facts as would be admissible in evidence, and shall show
> affirmatively that the affiant is competent to testify to the matters stated
> herein")

*Sheinkopf v. Stone*, 927 F.2d 1259, 1262 (1st Cir. 1991) (citations omitted).

In this case, Plaintiff's operative pleading, the amended complaint (ECF No. 16),

was filed under the penalty of perjury and Plaintiff's attestation was notarized. In addition,

in his statement of disputed facts filed in response to the motion for summary judgment,

Plaintiff asserts additional facts under the penalty of perjury. (PRDSMF, ECF No. 64.)

Although Defendants challenge the sufficiency of the submissions, the declarations are in

substantial compliance with 28 U.S.C. § 1746 and Federal Rule of Civil Procedure

56(c)(4), and thus appropriate for the Court to consider.[2]

---

[2] Defendants also challenge Plaintiff's submissions as untimely. Defendants filed the motion for summary judgment on November 7, 2018; Plaintiff filed his response, including his statement of disputed facts, on December 20, 2018. As part of his response, Plaintiff asserts that his ability to respond to the motion was hindered because his legal files have been destroyed. Without commenting on the merits of Plaintiff's contention that the defendants in this action were responsible for the destruction of the files, given that Plaintiff is incarcerated, given that had Plaintiff requested an extension to file his response by December 20, the Court likely would have granted the request, and given that Defendants had the opportunity to file a reply in response to Plaintiff's submissions, I will consider Plaintiff's submissions.

## A.    The Parties

In the spring of 2014, Plaintiff and his wife were living in a thirty-foot travel trailer parked on a property owned by James Thibodeau at 303 North Street, Ellsworth, Maine. (Amended Complaint ¶ 11 – 12.)  Pursuant to a verbal or "handshake" agreement, Plaintiff installed a septic tank on the property, used a shop on the property, and acted as a caretaker for the property.  (*Id.*)  The agreement also permitted Plaintiff to use a Kubota tractor.  (*Id.*) Plaintiff used the tractor to position the travel trailer close to the shop, and to pull the travel trailer away from the shop so that he could hook up the trailer to the hitch on his truck.  (*Id.* ¶ 15.)  Plaintiff had a set of tractor keys.  (DSMF ¶ 5.)

In the spring of 2014, Defendant Bires and Defendant Tokas were employed as City of Ellsworth police officers.  (DSMF ¶ 1.)  On May 16 or 18, 2014, Defendant Tokas went to the property at 303 North Street to address a dispute between Plaintiff and Mr. Thibodeau about the tractor.  (Amended Complaint ¶ 13; PRDSMF ¶ 5.)  Defendant Tokas informed Plaintiff and Mr. Thibodeau that their dispute was a civil matter and advised that one of them should file a civil complaint to resolve the issue.  (Amended Complaint ¶¶ 22 – 23; PRDSMF ¶ 5.)

---

[3] The following facts are drawn primarily from the Amended Complaint and Defendants' statement of material facts.  (ECF No. 59, hereinafter "DSMF.")  Some of the facts asserted in the Amended Complaint are also asserted in Plaintiff's statement of disputed facts. (PRDSMF, ECF No. 64.)  Where a genuine dispute of fact exists between the parties, both versions are included, or the facts are recounted in the light most favorable to Plaintiff.

## B.     The Attempt to Move the Tractor

On the morning of May 31, 2014, two men arrived at the property to load the tractor onto a flat-bed truck.  (Amended Complaint ¶ 16, PRDSMF ¶ 5.)  Mr. Thibodeau had apparently made a spare tractor key and given it to one of the men, James Jordan, in order to move the tractor off the property.  (Amended Complaint ¶ 15, PRDSMF ¶ 4 – 5.)  When one of the men started the tractor, Plaintiff tried to grab the key and shut the tractor down. (Amended Complaint ¶ 16.)  One of the men grabbed Plaintiff's forearm; and Plaintiff warned the man not to touch him.  (*Id.*)  Plaintiff subsequently "planted this person [into] the tractor seat at chest level pinning him," shut down the tractor, and removed the key from the tractor.  (*Id.*)

Plaintiff's wife called 911 about the dispute between Mr. Thibodeau and Plaintiff over the tractor.  (PRDSMF ¶ 4.)

## C.     The Confrontation with Defendant Bires

At approximately 8:30 a.m. on May 31, 2014, Defendant Bires was dispatched to the property to address the dispute between Mr. Thibodeau and Plaintiff.  (DSMF ¶ 3.) Defendant Bires spoke to Mr. Jordan first, and then spoke to Plaintiff.  (DSMF ¶ 4; PRDSMF ¶ 4.)  Plaintiff told Defendant Bires that Plaintiff had a verbal agreement, not a written one, with Mr. Thibodeau for use of the tractor, and that he had taken the key out of the tractor's ignition so that the tractor could not be moved.  (DSMF ¶¶ 5 – 6; PRDSMF ¶ 5 – 6.)  Defendant Bires then spoke with Mr. Thibodeau, who denied having any lease agreement with Plaintiff.  (DSMF ¶ 7.)

Defendant Bires returned to Plaintiff's trailer to speak with Plaintiff again, but Plaintiff had gone inside the trailer.  (*Id.* ¶ 8.)  There was a fence for Plaintiff's dog made of wooden pallets that obstructed access to the trailer's door, so Defendant Bires knocked on the side of the trailer to get Plaintiff's attention.  (DSMF ¶ 9; PRDSMF ¶ 9.)

### 1.    Plaintiff's Version of the Confrontation

Plaintiff asserts that the noise from Defendant Bires striking the travel trailer was so loud that it startled Plaintiff and his wife, and caused his service dog to start barking.  (Amended Complaint ¶ 18.)  Plaintiff went to the screen door of the trailer, where the dog was standing, and grabbed her by the collar before opening the door.  (*Id.*)  Plaintiff leaned his head out, holding the screen door with one hand and his dog with the other.  (*Id.*)

As Plaintiff started to tell Defendant Bires that he would come out, Defendant Bires pulled out his service pistol and pointed it at Plaintiff's head, screaming at Plaintiff to show his other hand.  (*Id.*)  Plaintiff said, "You know I am holding my dog."  (PRDSMF ¶ 13.)  Plaintiff told his wife to grab the dog because the officer had a gun pointed at his head; Defendant Bires screamed even louder, "Show me your f*****g hand now!"  (Amended Complaint ¶ 19.)  As his wife took the dog, Plaintiff responded, "Easy, easy, I'm bringing my other hand out right now real slowly."  (*Id.*)  Plaintiff slowly brought his other hand out to show Defendant Bires and stepped down one stair, exposing his whole body so that Defendant Bires could see that he had no weapons.  (*Id.*)

Defendant Bires continued yelling at Plaintiff, ordering him to hand over the tractor key.  (*Id.*)  Plaintiff interpreted this as an attempt to threaten and intimidate him.  (*Id.*)  Plaintiff responded, "No, I will not give you the key, I already explained to you that this

was a civil matter." (*Id.*) Defendant Bires screamed even louder, telling Plaintiff that if Plaintiff did not give Defendant Bires the key, he would come into the home, get the key, and arrest Plaintiff for theft and assault. (*Id.*) Defendant Bires kept his gun pointed at Plaintiff during this exchange. (*Id.*)

Plaintiff became angry and started yelling at Defendant Bires, stepping down to the ground and facing the officer, who was about fifteen feet away. (*Id.* ¶ 20.) Plaintiff repeated that he would not turn over the tractor key. (*Id.*) Plaintiff pointed to the middle of his own forehead and yelled, "Take your best shot. F**k you. I will not give you the key, I told you this is a civil matter." (*Id.*)

Defendant Bires placed his weapon back into his holster, turned, and walked away from Plaintiff, yelling that he would be back. (*Id.* ¶ 21.) Plaintiff asserts Defendant Bires pointed his gun at Plaintiff for more than five minutes during the confrontation. (PRDSMF ¶ 19.)

### 2. Defendant Bires' Version of the Confrontation[4]

According to Defendant Bires, when Plaintiff came to the door, Defendant Bires told Plaintiff that he would be charged with theft if he did not return the tractor keys, at which point "Plaintiff became very agitated and sent his dog out of the camper to get Defendant Bires." (DSMF ¶ 11.) The dog ran outside, growling at Defendant Bires.[5] (*Id.*

---

[4] Defendant Bires' version is recounted to illustrate the factual dispute. Because summary judgment requires the Court to view contested facts in the light most favorable to the non-movant, I assess the motion for summary judgment based on Plaintiff's version of the events.

[5] According to Plaintiff, his dog was growling at the door because she was startled by the loud noise from Defendant Bires striking the side of the trailer, but Plaintiff did not send his dog to attack Defendant Bires and his dog never ran outside at Defendant Bires. (PRDSMF ¶¶ 12 – 13.)

¶ 12.) When Defendant Bires saw Plaintiff standing in the doorway of the trailer concealing his right hand from view, Defendant Bires ordered Plaintiff to show his hands. (*Id.* ¶ 13.) Plaintiff responded by saying, "No, f**k you, shoot me." (*Id.* ¶ 14.) Because Defendant Bires believed Plaintiff might be holding a weapon in his concealed hand, Defendant Bires sought cover and drew his service pistol, continuing to give commands to Plaintiff to show his hands. (*Id.* ¶ 15.)

Plaintiff ignored Defendant Bires' commands to show his hands and repeatedly told Defendant Bires to shoot him. (*Id.* ¶ 17.) Defendant Bires maintains that Plaintiff never showed his right hand to Defendant Bires before going back inside the trailer, that Defendant Bires had his pistol drawn for approximately one minute, and that Defendant Bires never aimed the pistol at Plaintiff's head. (*Id.* ¶¶ 18 – 19.)

## D.    The Confrontation with Defendant Tokas

Defendant Bires returned to his cruiser to request backup, and Defendant Tokas responded to the scene. (DSMF ¶ 20.) Mr. Jordan informed Defendant Tokas that as he started the tractor, Plaintiff pulled the key out of the ignition. (*Id.* ¶ 21.) Defendant Bires also advised Defendant Tokas that Plaintiff was very agitated, that Plaintiff might have a weapon in the trailer, that Plaintiff had refused to show his hands to Defendant Bires, and that Defendant Bires had drawn his pistol as a result. (*Id.* ¶¶ 22 – 23.)

Because Defendant Tokas had interacted with Plaintiff previously and believed he had established a good rapport with him, Defendant Tokas went to the trailer to attempt to defuse the situation and convince Plaintiff to return the tractor key. (*Id.* ¶ 24.) When Defendant Tokas spoke with Plaintiff at the doorway of the trailer, Plaintiff denied

Defendant Tokas' request to return the tractor key. (*Id.* ¶ 25.) Defendant Tokas warned Plaintiff that he would be charged with theft if he did not return the key. (*Id.* ¶ 26.) Plaintiff reiterated that he considered the dispute to be a civil matter. (Amended Complaint ¶ 23.)

At the end of his earlier confrontation with Defendant Bires, Plaintiff had picked up a five-gallon gas can and brought it into the trailer. (Amended Complaint ¶ 21.) While speaking with Defendant Tokas, Plaintiff picked up the gas can, pointed to it with his other hand, and told Defendant Tokas, "Nobody is coming into my home, I'm not kidding." (PRDSMF ¶ 30.) Plaintiff said, "I've told you, I'm not giving you the tractor key, and if you all try to come into my home and attempt taking it by force, I will use this to stop you." (Amended Complaint ¶ 23.) Defendant Tokas replied, "Look, you don't want to do this, all you're going to accomplish is a police standoff, and it will not turn out good for you." (*Id.*) Plaintiff slammed the door. (*Id.*; DSMF ¶ 31.)

## E.     The Standoff

Defendant Tokas cleared residents from nearby homes and police officers formed a perimeter around Plaintiff's residence. (DSMF ¶¶ 32 – 34.) Officers made telephone contact with Plaintiff inside the trailer while waiting for a tactical team to arrive to take over the scene. (*Id.* ¶ 34.) Defendant Bires left the scene to prepare requests for a search warrant and an arrest warrant, which requests were approved by a Justice of the Peace. (*Id.* ¶ 36.) Defendant Tokas remained at the scene monitoring the situation. (*Id.* ¶ 38.)

Defendant Bires went off duty at approximately 9:00 p.m. on May 31, 2014 and had no further involvement in the standoff. (*Id.* ¶ 37.) Defendant Tokas left the scene at

approximately 8:40 p.m. on May 31, 2014 and had no further involvement in the standoff. (*Id.* ¶ 38.)

Throughout the night of May 31 and into the morning of June 1, police officers tried to end the standoff by various methods, including using a robot to break a window, and approaching the trailer in an armored vehicle to introduce a smoke box into the trailer. (Amended Complaint ¶ 24; Order at 12 – 13, ECF No. 50.)  At approximately 3:30 a.m. or 4:30 a.m. on June 1, as the trailer filled with smoke, Plaintiff exited the trailer holding a rifle and raised it at the police officer who inserted the smoke box into the trailer.  (Order at 12 – 13, ECF No. 50.)  Another police officer shot Plaintiff, striking him in the head. (Amended Complaint ¶ 23 – 24.)

## F.    Legal Proceedings

On June 7, 2016, Plaintiff pled guilty to a felon in possession of a firearm charge based on his possession of a rifle.  *United States v. Barnard*, (Minute Entry, ECF No. 234), 1:14-cr-0088-JAW.  The Court imposed a sentence that included seventy-eight months of incarceration.  *United States v. Barnard*, (Judgment, ECF No. 279), 1:14-cr-00088-JAW.

Plaintiff initiated this action by depositing the complaint into an institutional mailbox on June 1, 2016.  (DSMF ¶ 44.)  Plaintiff's complaint was docketed on June 3, 2016, (ECF No. 1), and an amended complaint was docketed on August 19, 2016.  (ECF No. 16.)  Plaintiff alleged that police officers and state entities violated his Fourth Amendment rights during the conflict, and Plaintiff asserted that other state actors subsequently violated his Eighth Amendment rights during his time in prison.  In a series of orders after review of Plaintiff's claim pursuant to 28 U.S.C. §§ 1915 & 1915A, and in

response to a motion to dismiss, the Court dismissed all defendants and claims except the claims against Defendants Bires and Tokas. (ECF Nos. 4, 14, 29, 50.)

SUMMARY JUDGMENT DISCUSSION

## A.     Excessive Force

The Fourth Amendment prohibits unreasonable searches and seizures and provides that no warrant shall issue except on a showing of probable cause. U.S. Const. amend. IV. Excessive force claims are evaluated under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (some internal quotation marks omitted) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). In the context of force applied to make an arrest, the relevant factors for consideration include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (the so-called *Graham* factors).

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. A court's assessment must also account for the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary

16

in a particular situation." *Id.* at 396 – 97. The test is an objective one: courts ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

### 1. Fourth Amendment Claim Against Defendant Tokas

According to Plaintiff's version of events, Defendant Tokas did not use any force during their encounter on the morning of May 31, 2014. Furthermore, because this Court's prior rulings prohibit Plaintiff from challenging the reasonableness of the shooting, (Order, ECF No. 50), to the extent Plaintiff contends Defendant Tokas contributed to the shooting, Plaintiff's claim fails.[6]

### 2. Fourth Amendment Claim Against Defendant Bires

#### a. Defendant Bires Seizure of Plaintiff

"To make out a Fourth Amendment excessive force claim, a plaintiff must show, as an initial matter, that there was a seizure within the meaning of the Fourth Amendment, and then that the seizure was unreasonable." *Stamps v. Town of Framingham*, 813 F.3d 27, 35 (1st Cir. 2016). "A Fourth Amendment seizure occurs when a police officer 'has in some way restrained the liberty of a citizen' through 'physical force or show of authority.'" *United States v. Camacho*, 661 F.3d 718, 725 (1st Cir. 2011) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 n.16 (1968)). "To determine whether an officer has restricted an individual's freedom of movement, courts determine the 'coercive effect of the encounter' by asking

---

[6] For the same reason, Defendant Tokas would also be entitled to summary judgment on the state law claim for assault, even if that claim were not barred by the statute of limitations. *See supra* part A-3.

whether 'a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.'" *Id.* (quoting *Brendlin v. California*, 551 U.S. 249, 255 (2007)).

> Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*United States v. Mendenhall*, 446 U.S. 544, 554 (1980). "The show of authority effects a seizure only when the defendant actually yields or submits to the show of authority." *United States v. Fields*, 823 F.3d 20, 25 (1st Cir. 2016) (citing *California v. Hodari D.*, 499 U.S. 621, 628–29(1991)).

Defendant Bires argues that he did not seize Plaintiff because Plaintiff refused to comply with Defendant Bires' orders. According to Plaintiff's version of the encounter, Defendant Bires drew his weapon, pointed the weapon at Plaintiff's head, and told Plaintiff to reveal his other hand. Plaintiff asserts he submitted to the show of authority by slowly revealing his hand and stepping out of his trailer in order to show Defendant Bires that he did not have a weapon. Given the display of the weapon and the nature of the confrontation as asserted by Plaintiff, which included Defendant Bires directing orders to Plaintiff, Plaintiff ultimately following Defendant Bires' command to show his other hand, and Plaintiff exiting the trailer, the encounter can reasonably be construed as "a seizure rather than a consensual encounter." *Camacho*, 661 F.3d at 725.

### b. *Defendant Bires' Use of his Service Pistol*

Under certain circumstances, police use of force "may be unreasonable under the Fourth Amendment even if officers do no more than threaten the occupants with firearms."

*Terebesi v. Torreso*, 764 F.3d 217, 240 (2d Cir. 2014). "[P]ointing a loaded gun at a suspect, employing the threat of deadly force, is use of a high level of force." *Espinosa v. City & Cty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010). "While police are not entitled to point their guns at citizens when there is no hint of danger, they are allowed to do so when there *is* reason to fear danger." *Baird v. Renbarger*, 576 F.3d 340, 346 (7th Cir. 2009). "The display of weapons, and the pointing of firearms directly at persons inescapably involves the immediate threat of deadly force. Such a show of force should be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at that time." *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1192 – 93 (10th Cir. 2001); *see also Mlodzinski v. Lewis*, 648 F.3d 24, 37 – 40 (1st Cir. 2011) (applying the *Graham* factors to an officer's conduct in pointing a weapon); *Stamps*, 813 F.3d at 40 – 41 (same).

Defendant Bires contends the nature and duration of the encounter, including that Plaintiff did not reveal his other hand and that the entire exchange took less than one minute, establishes the reasonableness of his conduct. If Defendant Bires' account was uncontroverted on the record, Defendant's argument for summary judgment might be persuasive. According to Plaintiff, however, Defendant Bires pointed his gun at Plaintiff's head almost immediately after Plaintiff opened the trailer door and continued to do so after Plaintiff showed his other hand, exited the trailer, and demonstrated that he did not have a weapon. Plaintiff asserts Defendant Bires displayed the weapon for approximately five minutes. Furthermore, the subject matter that prompted police involvement did not suggest an obvious safety concern. The matter (i.e., the dispute regarding the tractor) was relatively

minor and arguably, as Defendant Tokas reportedly informed Plaintiff and Mr. Thibodeau, was a civil matter. *See Robinson v. Solano Cty.*, 278 F.3d 1007, 1014 (9th Cir. 2002) (finding that pointing a gun at a plaintiff's head constituted excessive force because "[t]he crime under investigation was at most a misdemeanor; the suspect was apparently unarmed and approaching the officers in a peaceful way").[7]

Moreover, under Plaintiff's version of the facts, even assuming that Defendant Bires' decision to display his weapon was initially reasonable, Defendant Bires' decision, as alleged by Plaintiff, to point his gun at Plaintiff after Plaintiff had revealed his other hand and stepped out of the trailer to reveal that he did not have a weapon, could be considered unreasonable. *See Mlodzinski*, 648 F.3d at 39 ("And the gun pointed at Tina was not, on her version, lowered as soon as it was clearly safe to do so.") *Los Angeles Cty., California v. Rettele*, 550 U.S. 609, 615 (2007) (deploying force "any longer than necessary" can render a search unreasonable); *Stiegel v. Peters Twp.*, 600 F. App'x 60, 67 (3d Cir. 2014) (no Fourth Amendment violation because officer only drew his weapon "for a short amount of time and holstered it once the situation was under control"). If a fact finder accepts Plaintiff's version as credible, the fact finder could reasonably conclude Defendant Bires' continuing use of the weapon was excessive. "Where a person has

---

[7] Plaintiff's subsequent threat to use gasoline and his resistance to arrest would support Defendant Bires' argument that Plaintiff was noncompliant and represented a danger to Defendant Bires' safety. Defendant Tokas also asserts Plaintiff told Defendant Tokas that he had caused a prolonged police standoff previously. DSMF ¶ 28. Defendant Bires' actions, however, must be analyzed from the perspective of a reasonable officer at the time, "rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. The record does not establish that Defendant Bires was aware of those alleged facts when he pointed the gun at Plaintiff in the manner Plaintiff described.

submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person, in contrast to simply holding the weapon in a fashion ready for immediate use." *Holland*, 268 F.3d at 1192 – 93.

In sum, in this case, when the facts are viewed most favorably to Plaintiff, a fact finder could reasonably conclude that even if the initial display of the gun was reasonable, Defendant Bires' display of the gun for the duration and under the circumstances alleged by Plaintiff, including after Plaintiff showed his other hand and exited the trailer and while Defendant Bires demanded the key to the tractor,[8] was unreasonable.

### c. *Qualified Immunity*

A government official is entitled to qualified immunity unless she or he violates a constitutional right that was "clearly established" when they engaged in the conduct at issue. *Hunt v. Massi*, 773 F.3d 361, 367 (1st Cir. 2014). "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001)). "This strain of immunity aspires to 'balance [the] desire to compensate those whose rights are infringed by state actors with an equally compelling desire to shield public servants

---

[8] According to Plaintiff, Defendant Bires continued to point his gun at Plaintiff while demanding the key to the tractor after Plaintiff had shown his hands, exited the trailer, and demonstrated that he did not have a weapon. (Amended Complaint ¶¶ 18-19; PRDSMF ¶ 18-19.)

from undue interference with the performance of their duties and from threats of liability which, though unfounded, may nevertheless be unbearably disruptive.'" *Cox v. Hainey*, 391 F.3d 25, 29 (1st Cir. 2004) (quoting *Buenrostro v. Collazo,* 973 F.2d 39, 42 (1st Cir. 1992)).

Defendants' claim to qualified immunity requires a court to assess: (1) "whether the facts, taken most favorably to the party opposing summary judgment, make out a constitutional violation" and (2) "whether the violated right was clearly established at the time that the offending conduct occurred." *Ford v. Bender,* 768 F.3d 15, 23 (1st Cir. 2014). When a court considers whether the constitutional right was clearly established at the time, the court must determine (a) "whether the contours of the right, in general, were sufficiently clear," and (b) "whether, under the specific facts of the case, a reasonable defendant would have understood that he was violating the right." *Id.*

The constitutional prohibition against the use of excessive force has long been clearly established. *See, e.g.*, *Morelli*, 552 F.3d 12, 23 – 24 (1st Cir. 2009) (describing the law in this area as "crystal clear"). The qualified immunity analysis, however, requires a consideration of the particularized facts of the case, not broad general propositions. *Hunt*, 773 F.3d at 368. Thus, "the relevant question is not whether the Fourth Amendment generally prohibited excessive force." *Id.* "[T]he clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017). "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'"

*Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)). "To be clearly established, the contours of this right must have been 'sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'" *Id.* (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014)). "In other words, 'existing precedent must have placed the ... constitutional question beyond debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "[I]mmunity protects all but the plainly incompetent or those who knowingly violate the law." *White*, 137 S. Ct. at 551 (citation and internal quotation marks omitted).

Case law from the First Circuit and nearly every other circuit "plainly put police officers . . . on notice that pointing a firearm at a person in a manner that creates a risk of harm incommensurate with any police necessity can amount to a Fourth Amendment violation." *Stamps*, 813 F.3d at 42; *see also, Robinson*, 278 F.3d at 1015 (although the right was not clear in 1995, "[t]he development of the law with respect to arrests and detentions now allows us to recognize as a general principle that pointing a gun to the head of an apparently unarmed suspect during an investigation can be a violation of the Fourth Amendment, especially where the individual poses no particular danger"); *Checki v. Webb*, 785 F.2d 534, 538 (5th Cir. 1986) (a police officer that unjustifiably "brandish[es] a cocked gun in front of that civilian's face may not cause physical injury, but he has certainly laid the building blocks for a section 1983 claim against him").

The law also was clearly established that even if the initial display of a firearm might be reasonable, the continue display of the weapon after the perceived risk had been mitigated could be unreasonable. In *Mlodzinski v. Lewis*, 648 F.3d 24 (1st Cir. 2011) and

*Stamps v. Town of Framingham*, 813 F.3d 27 (1st Cir. 2016), the First Circuit denied qualified immunity at summary judgment to law enforcement officers who aimed their weapons at unarmed citizens after it became clear that the citizens did not present a threat, *Mlodzinski v. Lewis*, 648 F.3d 24 (1st Cir. 2011) and *Stamps v. Town of Framingham*, 813 F.3d 27 (1st Cir. 2016). Defendant Bires attempts to distinguish the cases in part by noting that the plaintiffs in *Mlodzinski* and *Stamps* were bystanders, whereas Plaintiff was a suspect. While the status of the plaintiffs was a factor in the First Circuit's reasoning, the court's reasoning does not suggest the fact was determinative. Indeed, in other cases where an officer pointed a weapon at a suspect of an investigation, other courts conducted the same inquiry that the First Circuit applied to bystanders in *Mlodzinski* and *Stamps*. *See Stiegel v. Peters Twp.*, 600 F. App'x 60, 66 (3d Cir. 2014); *Baird*, 576 F.3d at 343; *Robinson*, 278 F.3d 1007, 1014 (9th Cir. 2002).

Defendant Bires also contends that the cases are distinguishable because he is alleged to have displayed his weapon for a shorter period of time. For instance, in *Mlodzinski*, a plaintiff was held at gunpoint for seven to ten minutes, a longer period than the five minutes alleged here. *Mlodzinski* does not suggest a meaningful distinction between five and seven minutes. The First Circuit's logic centered on the fact that the officers kept their weapons pointed "far beyond the time it took" to determine whether there was a danger requiring the threat of imminent use of deadly force. *Mlodzinski*, 648 F.3d at 38; *see also*, *Barton v. Clancy*, 632 F.3d 9, 21 – 22 (1st Cir. 2011) ("This does not mean that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but rather that in the light of pre-existing law

the unlawfulness must be apparent") (internal quotation marks omitted); *Hall v. Ochs*, 817 F.2d 920, 925 (1st Cir. 1987) ("The fact that no court had put these pieces together in the precise manner we do today does not absolve defendants of liability").  The specific amount of time the weapon is displayed is not controlling – the established Fourth Amendment standard is whether the display of force continued "any longer than necessary." *Rettele*, 550 U.S. at 615.  While "qualified immunity can protect officers from litigation based on misjudgments about where lies the 'sometimes hazy border between excessive and acceptable force,'" Defendant Bires' alleged delay was not substantially closer to the hazy boundary than the officers in *Mlodzinski*.  *See Asociacion De Periodistas De Puerto Rico v. Mueller*, 680 F.3d 70, 81 (1st Cir. 2012) (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)).

Under Plaintiff's version of the facts, Defendant Bires aimed his weapon at Plaintiff's head immediately upon Plaintiff's appearance at the trailer door, and he continued to point his gun at Plaintiff after Plaintiff had shown his hands, exited the trailer, and demonstrated that he did not have a weapon.  In addition, and not insignificantly, Plaintiff asserts Defendant Bires continued to point the gun at him as he ordered Plaintiff to give him the tractor key.  Plaintiff's possession of the tractor key did not present concern for Defendant Bires' safety.  If believed, the facts alleged by Plaintiff could support a finding that Defendant Bires violated a clearly established constitutional right (i.e., to be free from excessive force in the form of a pointed gun in a situation in which any safety

concern had been alleviated and no other reason for the display and threat of force existed). Defendant Bires, therefore, is not entitled to qualified immunity.[9]

### 3. State Law Tort Claim

Plaintiff also asserts a claim against Defendants for the tort of assault under Maine law. (Amended Complaint ¶ 58.) The Maine Tort Claims Act (MTCA), 14 M.R.S. §§ 8101–8118, applies a policy of broad liability for the conduct of governmental employees, subject to several enumerated limitations and exceptions. *See Carroll v. City of Portland*, 1999 ME 131, ¶ 6, 736 A.2d 279, 282. One MTCA limitation is that "[e]very claim against a governmental entity or its employees permitted under this chapter is forever barred from the courts of this State, unless an action therein is begun within 2 years after the cause of action accrues." 14 M.R.S. § 8110. When state law governs a claim adjudicated in federal court, the federal court applies the relevant state's statute of limitations, including its accrual rules. *Quality Cleaning Prod. R.C., Inc. v. SCA Tissue N. Am., LLC*, 794 F.3d 200, 205 (1st Cir. 2015).

"[A] cause of action in tort is deemed to accrue when the plaintiff sustains a judicially cognizable injury: the moment when a wrongful act produces an injury for which the plaintiff is entitled to seek judicial vindication." *Myrick v. James*, 444 A.2d 987, 994 (Me. 1982) (superseded by statute on other grounds). Here, the incident began in the morning hours of May 31, 2014, and the Defendants went off duty that same evening. The

---

[9] In similar situations, the First Circuit has reiterated that a "denial of immunity on plaintiffs' version of the events" at the summary judgment stage "leaves these claims for trial, where defendants may try to persuade the jury that they did not do what they are accused of doing." *Mlodzinski*, 648 F.3d at 40; *Stamps*, 813 F.3d at 42.

only conduct that might give rise to liability for assault was Defendant Bires' pointing his service pistol at Plaintiff on the morning of May 31, 2014. The record reflects Plaintiff forwarded the complaint to the Court on June 1, 2016.

Plaintiff cannot rely on the ultimate shooting early in the morning of June 1, 2014, as a basis for a state tort claim. Under Maine law, defendants are only liable for harms "proximately caused" by their wrongful actions. *Webb v. Haas*, 1999 ME 74, ¶ 20, 728 A.2d 1261, 1267. "Proximate cause" refers to "that cause which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury, and without which the result would not have occurred." *Id.* (internal quotation marks omitted). An intervening cause of a plaintiff's harm is called a superseding cause, severing a defendant's liability, when the intervening cause is "neither anticipated nor reasonably foreseeable." *Ames v. Dipietro-Kay Corp.*, 617 A.2d 559, 561 (Me. 1992).

The conduct that plausibly supports an excessive force claim against Defendant Bires is Defendant Bires' display of his weapon on May 31, 2014; importantly, it is not the shooting by another officer on June 1, 2014. Plaintiff's state law claim arose, if at all, on May 31, 2014. Plaintiff did not initiate this lawsuit until June 1, 2016, one day after the statute of limitations period elapsed. Accordingly, any state law claim is barred by the MTCA's two-year statute of limitations, and Defendants are entitled to summary judgment on the state law claim. *See United States v. Marcello*, 212 F.3d 1005, 1010 (7th Cir. 2000) (denying a claim because it was filed one day later than permitted under the statute of limitations) (cited approvingly in *Lattimore v. Dubois*, 311 F.3d 46, 54 (1st Cir. 2002)).

## CONCLUSION

Based on the foregoing analysis, I deny without prejudice Plaintiff's motion for copies (ECF No. 60), but order the Clerk to forward to Plaintiff a copy of the Court's docket sheet in the case;  I deny Plaintiff's request to delay summary judgment ruling, (ECF Nos. 60, 62, 63); I deny Plaintiff's request for discovery, (ECF Nos. 60, 62, 63); I deny Plaintiff's motion to amend the complaint, (ECF Nos. 60, 62, 63); and I deny Plaintiff's motion to appoint counsel, (ECF Nos. 62, 63.)  In addition, I recommend the Court deny Defendants' motion for summary judgment on the federal claim against Defendant Bires based on Plaintiff's assertion regarding Defendant Bires' use of his service pistol during his encounter with Plaintiff on May 31, 2014.  I recommend the Court grant the motion for summary judgment on all other claims.  (ECF No. 58.)

## **NOTICE**

Any objections to an order issued herein shall be filed, in accordance with Federal Rule of Civil Procedure 72, within 14 days of being served with a copy of the order.

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 22nd day of March, 2019.